**EXHIBIT A**
**REPLY MEMORANDUM OF LAW**

| False/Deceptive/Contradicted Allegations and Contentions | Proof of Falsity/Deception/Contradiction |
|---|---|
| • "In late 2011, suspicions arose as to whether unauthorized users were accessing the Password Protected Website. An investigation was conducted, and in January 2012, a client of NXIVM who was on good terms with NXIVM, but who had not recently been active . . . , confirmed that she had not used her username and password since 2003, and yet NXIVM's records showed use of Client P's username and password through 2011." (Compl. ¶¶ 52-53.)<br>• "In late 2011, NXIVM first became suspicious that unauthorized users were accessing its Password Protected Website. . . . As a result, NXIVM had its IT personnel perform an investigation[.]" (Pl. Mem. at 3, Dkt. No. 53.)<br>• NXIVM "first became suspicious that its Password Protected Website was being accessed without authorization in late 2011, but was unable to confirm those suspicions it [sic] personnel completed their initial investigation in January 2012." (*Id*. at 14.)<br>• NXIVM "first became suspicious that its Password Protected Website had been accessed in late 2011, and was not able to confirm that unlawful access actually occurred until January 2012." (*Id*. at 15.)<br>• NXIVM "discovered the defendants' violation and unauthorized access to the Password Protected Website | • Mr. Myers testified that NXIVM suspected and investigated unauthorized access beginning August 7, 2011. (Myers Sept. Dep., Dkt. No. 86-3, at 3; *see also* Myers May Dep., Dkt. 86-3, at 9; Myers Decl. ¶¶ 9-11, Dkt. 95.)<br>• Ms. Bronfman similarly testified that NXIVM began to investigate possible unauthorized access after NXIVM material, which "could only have come from the NXIVM computers," appeared on Mr. Tighe's blog, and that the investigation led them to Ms. Pino. (Bronfman Dep., Dkt. No. 86-3, at 13.)<br>• NXIVM provided the New York State Police with screenshots of Mr. Tighe's blog captured on August 24, 2011, and again on September 19, 20 and 22, 2011, which contain materials allegedly obtained directly from NXIVM's website. (Grygiel Decl., Exs. D & E to Ex. 1, Dkt. Nos. 86-4 and 86-5.)<br>• Ms. Bronfman now confirms that NXIVM suspected and investigated unauthorized access beginning August 7, 2011. (Bronfman Decl. ¶¶ 24-29, Dkt. No. 92.)<br>• Ms. Bronfman now reveals that Ms. Pino was contacted on October 25, 2011, when she denied having accessed NXIVM's website since 2003. (*Id*. ¶ 35.)<br>• Mr. Wolford confirms that NXIVM became suspicious of potential unlawful access in August 2011, commenced an investigation, identified Ms. Pino as someone who accessed the website on a "fairly regular basis" and contacted Ms. Pino on |

1

| | |
|---|---|
| in January 2012." (*Id*. at 17.)<br>• "Suspicious activity prompted NXIVM in late 2011 to undertake an in-depth investigation into whether someone had improperly obtained Client P's login credentials to gain access to NXIVM's site. . . . However, NXIVM was not presented with a sworn affidavit from Client P until January 2012 when she 'confirmed that she had not used her username and password since 2003' despite the fact that 'NXIVM's records showed use of Client P's username and password through 2011.'" (Wolford Sept. 15, 2015 Ltr., Dkt. No. 82.) | October 25, 2011. (Wolford Decl. ¶¶ 8-10, Dkt. No. 93.)<br>• Ms. Nichols confirms that "it became apparent to NXIVM prior to October 22, 2011 that confidential and proprietary information was being made available to persons who had no right to that information," and thus "NXIVM conducted an extensive investigation." (Nichols Decl. ¶ 5, Dkt. No. 94.)<br>• "[W]hile NXIVM may have had *suspicions* as early as September 2011, that third parties had unlawfully accessed NXIVM's password protected website, it did not *know* that the NXIVM server had been accessed." (Opp. Br. at 15, Dkt. No. 91 (emphasis in original).) |
| • "Based upon the fact that Mary Pino's logins appeared directly related to disclosures on John Tighe's blog, we believed that there was in fact a mole, which could have been Mary Jane Pino. We also suspected other members to be moles. Since her login credentials were a possible source of the information being disclosed as a precaution, we determined it was necessary to block her credentials on September 27, 2011." (Myers Decl. ¶ 11, Dkt. No. 95, at 3.) | • "By checking the login attempts using (DB), we noticed that Mary Jane Pino (MJP) had an unusual amount of logins in between 2010 and 2011. Clare and I suspected that the MJP login (maryjane) was being used by someone other than Mary Jane Pino to access our system with the intent to steal information." (Myers Sept. Dep., Dkt. No. 86-3, at 3.) |
| • The fact that certain defendants had NXIVM's client list "did not place NXIVM on notice" that its website had been accessed "because the website was **not the only source** of this information." (Pl. Mem. at 14, Dkt. No. 53 (emphasis in original).)<br>• "Because there were other sources of this information, . . . NXIVM at the time of the publications reasonably did not suspect that the defendants were illegally accessing its Password Protected Website." (*Id*. at 19.) | • Ms. Bronfman testified that the client list "could have only come from the NXIVM computers[,]" and that as a result NXIVM conducted an investigation that led them to Ms. Pino. (Bronfman Dep., Dkt. No. 86-3, at 13.)<br>• Mr. Myers testified that "[t]he daily audits of the system were not always done until some material from the website began to show up on the blog at Saratoga in Decline." (Myers Sept. Dep., Dkt. No. 86-3, at 9.)<br>• Mr. Myers further testified that he "was advised by Clare |

2

| | |
|---|---|
| | Bronfman that a current NXIVM client list was posted on a blog site. The list appeared to be a mirror image of information accessible only through the NXIVM website by members of NXIVM." As a result, Myers, Ose and Bronfman began an investigation which resulted in the identification of Ms. Pino's account, and caused "[Bronfman] and [Myers to] suspect[] that the [Pino] login . . . was being used by someone other than Mary Jane Pino to access [NXIVM's] system with the intent to steal information." (*Id.*, at 3.)<br><br>• Mr. Wolford confirms that the publication of NXIVM's information on Mr. Tighe's website triggered NXIVM to conduct an internal investigation. (Wolford Decl. ¶¶ 8-9, Dkt. No. 93.)<br><br>• Ms. Nichols confirms that the publication of NXIVM's information on Mr. Tighe's website triggered NXIVM to conduct an "extensive investigation" prior to October 22, 2011. (Nichols Decl. ¶ 5, Dkt. No. 94.) |
| • "Given that the logins using Client P's username and password on their face appeared legitimate and valid, it was not unreasonable to assume that they were." (Wolford Sept. 15, 2015 Ltr., Dkt. No. 82, at 2.) | • Mr. Myers testified that sometime between August 7 and early September, 2011, he reviewed the log ins "to determine if they were **active or suspicious in nature**. Through a process of elimination," Mr. Myers identified Ms. Pino. (Myers May Dep., Dkt. No. 86-3, at 9 (emphasis supplied).)<br><br>• Mr. Myers similarly testified that he reviewed the log ins "for **any unusual activity** of a particular member. By checking login attempts using (DB), we noticed that Mary Jane Pino (MJP) had an unusual amount of logins in between 2010 and 2011." As a result, he and Bronfman "suspected that the [Pino] login . . . was being used by someone other than Mary Jane Pino to access [NXIVM's] system with the intent to steal information." (Myers Sept. Dep., Dkt. No. 86-3, at 3 (emphasis supplied).)<br><br>• "One of NXIVM's clients, who was in good standing, Mary Jane |

3

|  | Pino, had been accessing the password protected website of plaintiff on a fairly regular basis, even though she has not been an active client of NXIVM since 2003.  NXIVM **therefore hired an investigator** to track down Mary Jane Pino." (Wolford Decl. ¶ 10, Dkt. No. 93 (emphasis supplied).) |
|---|---|
| - "It was identified during the period of February 3, 2010 through September 27, 2011, that Mary Jane Pino logged in on multiple occasions.  Although this raised suspicions, it was not possible for me to determine if in fact Mary Jane Pino was logging in or someone else was logging in with her credentials either with or without her permission." (Myers Decl. ¶ 10, Dkt. No. 95.)<br>- "It was not possible for me to confirm, based on the data obtained from the NXIVM system, whether Mary Jane Pino herself, or someone else using her login credentials, was logging into the NXIVM system." (*Id*. ¶ 12.)<br>- "It was sometime after May 2012, not September, 2011, that I was able to identify occasions where multiple IP addresses were logged into the system on the same day and at the same time using Mary Jane Pino's credentials as described in my September, 2012 statement to the police." (*Id*. ¶ 15.)<br>- "As set forth above, NXIVM did not, and could not, confirm the unauthorized access based upon the information captured by the NXIVM system." (*Id*. ¶ 22.)<br>- "Although we were suspicious of these logins, it was impossible for our IT team to determine definitively from the information NXIVM had, whether it was PINO or someone unlawfully using her login credentials." (Bronfman Decl. ¶ 29, Dkt. No. 92.) | - "[Ms. Bronfman] and I suspected that the MJP login . . . was being used by someone other than Mary Jane Pino to access our system with the intent to steal information. [Ms. Bronfman] determined that the actual person associated with the username (Mary Jane Pino) was an active member in good standing . . . but that she had not been participating or using her membership. . . . **I then conducted a search** through public information to determine the physical location of the IP addresses recorded." (Myers Sept. Dep., Dkt. No. 86-3, at 4 (emphasis supplied).)<br>- NXIVM's records show "login used, when and what IP address that person is connecting with [NXIVM's] server" and "exactly what was accessed/downloaded by each IP address." (*Id.*, at 3.)<br>- NXIVM's records (certified as business records) established that the Pino login credentials were used at more than 100 times over the course of less than two years, from about 15 different IP addresses.  The records further establish that the credentials were used from different IP addresses on the same day close in time. (Grygiel Decl. Ex. I, Dkt. No. 86-6, at 25-31.<br>- NXIVM had access to publicly available data that would permit it to identify "the general location associated with the IP address," which it ultimately used in preparing its evidence for the State Police.  (Myers Sept. Dep, Dkt. No. 86-3, at 3); *see, e.g.,* http://whatismyipaddress.com/ip-lookup and http://iplocationtools.com/index.html.  NXIVM concedes that this publicly available information was used to determine that the "MJP logins traced back to a number of geographically |

4

| | |
|---|---|
| <ul><li>"[T]he unlawful access could not be established based upon the data known to NXIVM in September, 2011, and NXIVM could not confirm who was logging in using Mary Jane Pino's credentials[.]" (*Id.* ¶ 34.)</li><li>"Until October 25, 2011, NXIVM did not and could not confirm if the information was being obtained by somebody who had legitimate access to the NXIVM website or NXIVM documents, but who was acting as a 'mole' or internal spy, to try to discredit and damage the organization." (Nichols Decl. ¶ 6, Dkt. No. 94.)</li></ul> | distant locations, including at least one instance where the login was used at the same time period in two geographically distant locations." (Myers Sept. Dep., Dkt. No. 86-3, at 4.)<ul><li>NXIVM could have immediately contacted Ms. Pino and asked her about her use of her password, particularly if, as NXIVM alleged, Ms. Pino "was on good terms with NXIVM[.]" (Compl. ¶ 53.) NXIVM does not disclose why it hired the investigator, when it did so, and why it took the investigator so long to find her.</li></ul> |
| <ul><li>NXIVM argued that the statute of limitations was not triggered until after January 2012, that it did not have a "reasonable opportunity" to discover the alleged unauthorized access "prior to January 2012," and that, in any event, it was a "question of fact" whether it had such a "reasonable opportunity." (*See* Pl Mem. at 17-21, Dkt. No. 53.)</li></ul> | <ul><li>"Although Ms. Pino did not confirm her statement until January 30, 2012, it was as of October 25, 2011, that we, as NXIVM's attorneys, believed in good faith that the statute of limitations would begin running…." (Nichols Oct. Decl. ¶ 10, Dkt. No. 94.)</li><li>"NXIVM and counsel used October 25, 2011 as the date the two year statute of limitations had begun to run, even though it was possible at that time that Ms. Pino was not being truthful." (Wolford Oct. Decl. ¶ 10, Dkt. No. 93.)</li></ul> |
| <ul><li>Ms. Pino "was on good terms with NXIVM" and "had been a NXIVM coach." (Compl. ¶¶ 53-54).</li></ul> | <ul><li>Ms. Pino informed the State Investigator that she had merely "attended classes with NXIVM/ESP in 2001- to 2002," and that when she stopped taking classes she advised NXIVM "to no longer contact her for future trainings and regrets taking the classes." (Grygiel Oct. 26, 2015 Decl., Ex. A, at 7.)</li><li>None of NXIVM's declarants state that Ms. Pino was a coach. Ms. Bronfman testifies that Ms. Pino had merely "taken some classes" with NXIVM, not that she was a coach. (Bronfman Decl. at 2, Dkt. No. 92; *see also* Bronfman Dep., Dkt. No. 86-3, at 13 (stating that Ms. Pino "had taken some classes" about ten years earlier).)</li><li>For reasons NXIVM fails to explain or disclose, NXIVM opted to</li></ul> |

|  |  |
|---|---|
|  | • hire an investigator rather than simply reaching out to Ms. Pino, who could have been located through a simple internet search. |
| • "NXIVM's Password Protected Website can only be accessed with a NXIVM username and password, **or by using a specialized formula** . . . ." (Compl. ¶ 33 (emphasis supplied).) | • "NXIVM maintains a confidential and proprietary website that requires personal credentials (user names and passwords or **full name, birth year, and assigned ID number**) to gain access." (Myers Decl. ¶ 5, Dkt No. 95 (emphasis supplied).) |
| • "<u>Sewell</u> was decided on very specific facts that were substantially dissimilar to the facts in NXIVM's case. We argued that <u>Sewell</u> should be limited to its facts, and that dictum from the Court on what its holding could mean in other cases was not a sufficient reason to withdraw the pleading." (Nichols Decl. ¶ 15, Dkt. No. 94.)<br><br>• "NXIVM's September 15, 2015 letter to the only described NIXVM's (sic) interpretation of the <u>Sewell</u> decision and did not allege factual statements . . . ." (Wolford Decl. ¶ 29, Dkt. No. 93.) | • NXIVM's September 15, 2015 letter speaks for itself, but note that it does not suggest "that <u>Sewell</u> should be limited to its facts," and it does allege factual statements, including the very factual allegations that NXIVM has conceded are not true. (*See* Wolford Sept. 15, 2015 Ltr., Dkt. No. 82.) |

*ALB 1889248v2*